STATE of Missouri, Respondent,

v.

Edward Leslie WILLIAMS, Appellant.

No. 57559.

Supreme Court of Missouri,
Division No. 2.

Nov. 13, 1972.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Larry R. Marshall, Columbia, for appellant.

HOUSER, Commissioner.

Edward Leslie Williams, charged with illegal possession of marijuana, tried and convicted by the court without a jury, and sentenced to two years' imprisonment has appealed. We have jurisdiction of this felony appeal because the notice of appeal was filed prior to January 1, 1972. Constitution of Missouri, 1945, Art. V, § 31, V. A.M.S.

In April, 1969 appellant was convicted of malicious destruction of property, a misdemeanor. Paroled by the judge of the Randolph County Circuit Court, his parole was revoked in June, 1970 and he was incarcerated in the county jail. In October, 1970 he was again paroled by order of that circuit court conditioned that he maintain residence at Halfway House in Columbia, a regional treatment center operated by the state board of probation and parole for high-risk parolees and probationers. The primary reason the parole officers recommended that appellant be placed in residence there was their feeling that appellant needed "very intensive supervision." The residents of Halfway House were under the direct supervision of board officer Kauffman, who lived with his wife on the premises in an apartment on the first floor. Kauffman's entire case load consisted of the 7 or 8 residents. A treatment-oriented facility, Halfway House is an older home with four bedrooms and a bath on the second floor, Kauffman's living quarters on the first floor, and four rooms, including a kitchen and bedroom, in the basement. Officer Kauffman was responsible to his supervisor and ultimately to the court for all the people residing there; for physically taking care of the home; maintaining the property; dealing with the residents; trying to help the individuals to deal with society, keep out of prison and avoid further trouble with the law. As a part of his responsibility Kauffman frequently visited all parts of the house to see whether the residents were keeping their rooms clean, whether repairs were necessary, etc. Appellant and two other parolees occupied one of the upstairs bedrooms, which had a common walk-in closet. Individual rooms were not

equipped with locks and keys. Appellant signed documents agreeing to abide by certain rules while living at Halfway House, such as keeping his room clean, not possessing liquor or narcotics, etc. These documents did not expressly waive appellant's constitutional rights as to unreasonable searches and seizures. Residents were required to pay a certain percentage of their earnings as rent and were told to consider Halfway House to be their home. Officer Kauffman conducted group therapy sessions with the residents from time to time, and communicated with and observed appellant's behavior "every day practically speaking." Officer Perry, Kauffman's immediate superior, spoke to appellant twice about drugs, prior to the latter becoming a resident of Halfway House. On these occasions appellant told Officer Perry his feelings about drugs, stating that he had used drugs; that he felt the laws pertaining to marijuana were "unrealistic"; that it was unfair for society to have laws making it illegal; that it was a matter for individual decision whether or not to use drugs, and that in his opinion there was nothing wrong with using drugs, particularly marijuana. After becoming a resident of Halfway House appellant on several occasions expressed the same views to Officer Kauffman, who concluded that appellant's attitude was one of disagreement with the laws, and that he had a propensity to be involved in drugs. Although Kauffman had never seen appellant with marijuana or other drugs in his possession or on the premises he became suspicious of his behavior and actions, considering appellant's past experience with drugs and his views on drug use, the fact that twice liquor had been found on the premises, and that on the day in question two people (hippie types, with long hair and bizarre clothing) stopped at Halfway House, asked to see "William Edwards," and when told there was no one residing there by that name looked confused and said he had told them he lived at that address. On the evening of November 5, 1970, in the absence of appellant and without his consent, Kauffman "decided to just take a look around." He entered appellant's room without a search warrant or arrest warrant and searched for what he thought might be contraband. Kauffman thought he had a right to make the search as a parole officer and for the further reason that he was responsible for the house and for each resident; "responsible for anything they might do while living there that [might] reflect upon other residents or the facility in general." Kauffman went into the closet and examined the contents of appellant's knapsack, which he found on top of a dresser in the closet. At the bottom of the knapsack, under some dirty laundry, Kauffman found a paper bag containing eight packets of material which laboratory examination proved to be marijuana. Kauffman reported to his superior, Officer Perry, who suggested that the city police be called and that appellant be picked up on a parole violation warrant. Kauffman made out and signed such a warrant, directed to the police chief, and took it to the police station. Three uniformed city police officers then took appellant into custody about 1:15 or 1:30 a. m. on November 6 and the three police officers, together with Officer Kauffman, brought appellant to the police station. There he was interviewed in the reception room by Parole Officers Perry and Kauffman for about 20 minutes. Officer Perry at that time advised appellant that he did not have to answer any questions; that if he did what he said could be used against him in court; that if at anytime during the questioning he chose not to answer he did not have to do so and that he had a right to have an attorney present during questioning. He omitted to inform appellant that the court would appoint an attorney if he could not afford one. In the course of the conversation appellant stated that the marijuana found in his room was in fact his and that he obtained it from a friend who owed him a debt for past favors.

Sometime between 9 and 10 a. m. on November 6 Officer Kauffman delivered to the Columbia Police Department the substance found in the search. City Police Officer Muse interrogated appellant, beginning about 10 a. m. on that date. Before doing so he fully advised appellant with respect to his constitutional rights, including his right to appointment of counsel if unable to afford a lawyer, following which he took written statements in which appellant admitted his guilt of possessing marijuana. No promises, offers, threats or coercive measures were employed and appellant was cooperative.

A motion to suppress the evidence gained by the search was filed and overruled. Thereafter a motion to suppress the incriminating oral and written statements was filed, taken with the case and eventually overruled.

Appellant asserts that although a parolee he was entitled to certain basic constitutional rights against unreasonable searches and seizures and self-incrimination; that the court erred in admitting in evidence the marijuana and the testimony of the parole and police officers because the narcotic and the incriminating statements were the fruit and product of an unlawful seizure and arrest of appellant; that the search was made without probable cause, warrant or other lawful authority and not as an incident to a lawful arrest; that the evidence was obtained in violation of appellant's privilege against self-incrimination; that appellant was not properly advised that he had a right to remain silent and anything he said could be used against him in a new felony proceeding, and that he did not knowingly, intelligently and voluntarily waive his right against self-incrimination; that the statements were obtained in violation of his constitutional rights to

counsel, in that he was not advised that an attorney would be appointed for him if he could not afford one, and that he had a right to have counsel present during questioning and did not waive that right; that the oral statement constituted the fruit of an unlawful search because the arrest resulted from an unlawful search and seizure; that the subsequent written statements introduced in evidence were a direct result of the previous illegally obtained oral statement to the parole officers.

We start out with the State's concession that the warrantless, exploratory search, not made as an incident to a lawful arrest, "would have been illegal if an ordinary citizen had been the subject of the search" because of lack of probable cause. Noteworthy is the further fact that appellant's conviction did not suspend his civil rights under § 222.010 [1] for the reason that he was convicted of a misdemeanor and sentenced to imprisonment in a county jail (and not to imprisonment in "an institution within the department of corrections"). Finally, the search was instituted and made by a parole officer acting on his own initiative, so we do not have the complicating factor of a search conducted by a parole officer acting as the agent, tool or "front" for the police, or at the instigation of or jointly with the police.

In this background and under the particular circumstances of this case the court did not err in overruling the motions to suppress the fruits of the search and in admitting in evidence the marijuana.

The first broad question is whether this parolee, living under close, daily supervision and surveillance of a parole officer in a state-operated treatment facility under a restricted regimen designed to serve the twin purposes of protecting society and rehabilitating the parolee, is entitled to the

---

1. All section references are to RSMo 1969, V.A.M.S. Section 222.010 provides: "A sentence to imprisonment in an institution within the state department of corrections for a term less than life suspends all civil rights of the persons so sentenced during the term thereof, and forfeits all public offices and trust, authority and power; and the person sentenced to imprisonment for life shall thereafter be deemed civilly dead."

same constitutional protection from unreasonable searches and seizures enjoyed by other citizens who have not been in the toils of the law. The narrow included question is whether the search of appellant's room and effects and the seizure of contraband by appellant's parole officer under the circumstances of this case violated his constitutional rights. This is a case of first impression in Missouri. While there is a division of authority elsewhere we are persuaded that the decisions in California and New York point the way to the proper answer to these questions.

■ We recognize that a parolee by virtue of his status is not thereby deprived of all protection against unreasonable searches and seizures and other invasions of constitutional rights.[2] On the other hand, a parolee is not afforded the full panoply of constitutional protection enjoyed by ordinary citizens possessed of full civil rights, and a search of a parolee's premises is not to be tested by the rules applicable to the latter. People v. Thompson, 252 Cal.App. 2d 76, 60 Cal.Rptr. 203, 209 [1]; People v. Quilon, 245 Cal.App.2d 624, 54 Cal.Rptr. 294, 297 [2].

■ Inmates of prisons may be subjected to intense surveillance and search, unimpeded by Fourth Amendment barriers. Lanza v. New York, 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384. "A convict loses a great measure of his protection against unreasonable searches and seizures." Burns v. Wilkinson, W.D.Mo., 333 F.Supp. 94, 96. The reasons are related to security or rehabilitative purposes. Jones v. Wittenberg, N.D.Ohio, 323 F.Supp. 93, 98 [3]. Likewise, on analogy, the constitutional rights of parolees are curtailed for the following reasons: Prisoners released from imprisonment on parole are held to have accepted the favor of a parole subject to that degree of surveillance and search required under the circumstances for the effective supervision of the parolee and the protection of the public. Although physically no longer behind the walls a prisoner released on parole is not free. He is at all times in custodia legis, under the limitations and conditions of a parole order which at all times is subject to revocation in the discretion of the circuit judge. § 549.101. The parolee is still a prisoner in a legal sense insofar as it is necessary to maintain supervision over him. In order to promote the objective of rehabilitation, diminish recidivism and concurrently safeguard society from further criminal depredations close supervision, surveillance and control of parolees by correctional authorities is vital. People v. Denne, 141 Cal.App.2d 499, 509, 297 P.2d 451. Because of the conditional nature of the parolee's freedom some diminution of his right of privacy necessarily results and some intrusions by parole officers may be reasonable "even if the information relied on by the parole officer does not reach the level of probable cause generally required under the Fourth Amendment". People v. Anglin, 18 Cal. App.3d 92, 95 Cal.Rptr. 588, 589 [1], citing four California cases. And see People v. Gilkey, 6 Cal.App.3d 183, 85 Cal.Rptr. 642, 645. The following cases arising in the State of New York reaffirm the principle of law that a parolee's Fourth Amendment protection against unreasonable searches and seizures by his parole officer is diminished on account of his status as a parolee. United States ex rel. Randazzo v. Follette, 2 Cir., 418 F.2d 1319; People v. Way, 65 Misc.2d 865, 319 N.Y.S.2d 16; People v. L'Hommedieu, 62 Misc.2d 925, 310 N.Y.S.2d 369; People v. Sickler, 61

2. For instance, he may assert constitutional guaranties and safeguards against arbitrary or oppressive official action, invidious discrimination, harassment, etc. People v. Hernandez, 229 Cal.App.2d 143, 40 Cal.Rptr. 100, 104; In re Jones, 57 Cal.2d 860, 862, 22 Cal.Rptr. 478, 372 P.2d 310; People v. Thompson, 252 Cal. App.2d 76, 60 Cal.Rptr. 203, 209 [1]; United States ex rel. Sperling v. Fitzpatrick, 2 Cir., 426 F.2d 1161, 1164 [5]. See also Brown v. Kearney, 5 Cir., 355 F.2d 199, 200; Martin v. United States, 4 Cir., 183 F.2d 436, 439; United States v. Hallman, 3 Cir., 365 F.2d 289, 291.

Misc.2d 571, 306 N.Y.S.2d 168; People v. Chinnici, 51 Misc.2d 570, 273 N.Y.S.2d 538; People v. Langella, 41 Misc.2d 65, 244 N.Y.S.2d 802; People v. Santos, 25 N.Y.2d 976, 305 N.Y.S.2d 365, 252 N.E.2d 861; People v. Randazzo, 15 N.Y.2d 526, 254 N.Y.S.2d 99, 202 N.E.2d 549, cert. den. 381 U.S. 953, 85 S.Ct. 1810, 14 L.Ed.2d 725. Neither the Fourth Amendment nor comparable state constitutional provisions insulate a parolee from reasonable scrutiny. "The distinction is that the protection afforded by the Fourth Amendment is only against unreasonable searches, and what is reasonable in the case of a parolee is not the same as what is reasonable in the case of another (United States ex rel. Randazzo v. Follette, 282 F.Supp. 10). The very concept of parole entails a degree of supervision of parolees consonant with its purposes. Included within that supervision would be such searches as would reasonably be called for." People v. Santos, 31 A.D.2d 508, 298 N.Y.S.2d 526, 528 [5]. "He may not assert these guaranties against the correctional authorities who supervise him on parole. (See Story v. Rives, 68 App. D.C. 325, 97 F.2d 182, 188.) If this constitutional fact strips him of constitutional protection against invasions of privacy by his parole officer, the answer is that he has at least as much protection as he had within the prison walls. He did not possess this guaranty in prison and it was not restored to him when the gates of parole opened." People v. Hernandez, supra, 40 Cal.Rptr. l. c. 104 [7].

■■ In the case of appellant, who was in daily close contact with his parole officer in a living situation in which his life, conduct and activities were an open book under constant surveillance, the parole officer was authorized by the very nature of their relationship to subject him, his room and his effects to inspection and search if in the reasonable exercise of the officer's judgment in the administration of the parole such an inspection and search was deemed advisable. People v. Hernandez;[2] People v. Quilon, supra; People v. Triche,

148 Cal.App.2d 198, 202–203, 306 P.2d 616, 618; People v. Robarge, 151 Cal.App.2d 660, 665–666, 312 P.2d 70; People v. Thompson;[2] People v. Denne, supra. Officer Kauffman was possessed of sufficient information to arouse suspicion that this parolee was involved in some way in drug use or traffic, and we cannot say that his exercise of judgment in determining to make the search was unreasonable under the circumstances. On the contrary, considering the information possessed by the parole officer, the special relationship between him and appellant at Halfway House, and his responsibility not only to appellant but also to his supervisor and to the public at large, the parole officer's action meets the test. See People v. L'Hommedieu, supra; People v. Denne, supra. We rule the search not unreasonable under constitutional provisions and the marijuana seized in the search properly admissible in evidence.

■ The judgment of conviction, however, must be reversed for error in the admission in evidence of (1) the testimony of Parole Officers Perry and Kauffman, both of whom testified that following his arrest, and at the city police station under questioning by Officer Perry, appellant admitted that he acquired possession of the marijuana, after Officer Perry, in apprising appellant of his Miranda rights, failed to inform him that the court would appoint an attorney for him if he could not afford one; (2) the testimony of the police officer who subsequently took a written confession from appellant, and (3) the written confession.

■ The court erred in receiving (1). At the time the incriminating statement was made to the parole officers appellant had been arrested by uniformed police officers, taken by them to the police station in the early hours of the morning suspected of the commission of another and independent crime, interrogated by parole officers in a police department atmosphere after having been deprived of his freedom as

a parolee, and after the constructive custody on parole had been transformed into actual physical custody under circumstances involving the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," thus requiring adequate, effective and *full* apprisal of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 719, 10 A.L.R.3d 974, 1007. Miranda requires officers of the Missouri State Board of Probation and Parole in the investigation of facts involving the possible commission by an indigent parolee of a fresh or new felony to give the parolee all four of the Miranda warnings, where he has been arrested and taken into actual police custody. State v. Lekas, 201 Kan. 579, 442 P.2d 11; People v. Gastelum, 237 Cal. App.2d 205, 46 Cal.Rptr. 743.

"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that *if he is indigent a lawyer will be appointed to represent him.* Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent— the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present." (Our italics.) Miranda, 384 U.S. at 473, 86 S.Ct. at 1627.

Miranda requires complete advice on all four points. Warnings which omit the advice that an attorney will be appointed for the suspect if he cannot afford an attorney are fatally defective. United States v. Fox, 2 Cir., 403 F.2d 97; Byers v. Oklahoma City, Okla.Crim.App., 497 P. 2d 1302; Groshart v. United States, 9 Cir.,

392 F.2d 172. And see Windsor v. United States, 5 Cir., 389 F.2d 530; Duckett v. State, 3 Md.App. 563, 240 A.2d 332; Brown v. Heyd, E.D.La., 277 F.Supp. 899.

The court erred in receiving (2) and (3) above for the reason that the subsequent confessions were the tainted fruit of the illegally obtained incriminating statements made to the parole officers by appellant a few hours earlier in the same morning, under the authorities cited and for the reasons elaborated in State v. Lekas, supra, 442 P.2d l. c. 18–20, under substantially the same factual background.

Reversed and remanded for a new trial.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court.

MORGAN, P. J., and HENLEY, J., concur.

DONNELLY, J., concurs in result.