STATE of Missouri, Respondent,

v.

Lindell BLACK, Appellant.

No. 39796.

Missouri Court of Appeals, Eastern District, Division Four.

July 3, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 11, 1979.

Application to Transfer Denied Nov. 14, 1979.

Shaw, Howlett & Schwartz, James J. Knappenberger, Clayton, for appellant.

John D. Ashcroft, Atty. Gen., Paul R. Otto, Carson W. Elliff, John M. Morris, III, Asst. Attys. Gen., Jefferson City.

Gary E. Stevenson, Pros. Atty., Thomas L. Ray, Jr., Asst. Pros. Atty., Farmington, for respondent.

SATZ, Judge.

Defendant was found guilty by a jury of exhibiting a dangerous and deadly weapon in a rude, angry or threatening manner. The jury was unable to agree on punishment, and the court imposed a sentence of four years imprisonment.

As grounds for his appeal, defendant contends: (1) he was denied his Sixth Amendment right to a speedy trial; (2) he was prejudiced by the state being permitted to amend the information against him just prior to trial; (3) the state's cross examination of him was unduly broad, and his cross examination of the victim was unduly restricted; and (4) there was an impermissible variance between the verdict directing instruction and the information filed against him. For the following reasons, we affirm the judgment of conviction and sentence entered by the trial court.

Defendant's first asserted right—his Sixth Amendment right to a speedy trial—is applicable to state prosecutions. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Describing

the right to a speedy trial as "amorphous" and "slippery", the Supreme Court adopted an ad hoc analysis and detailed several factors which must be weighed against each other to determine whether a defendant has been denied this right. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The factors to be considered are: (1) length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) prejudice to the defendant resulting from the delay. *Id.* at 530, 92 S.Ct. 2182. The test is obviously not designed to supply simple, automatic answers to complex questions, but rather, it serves as a framework for "a difficult and sensitive balancing process". *Id.* at 533, 92 S.Ct. at 2193. Thus, the right necessarily depends upon the facts and circumstances of each case.

In the present case, the undisputed time sequence of significant events to which the *Barker* factors must be applied started with an altercation involving defendant and a Larry Turner late at night on July 16, 1974, or the early morning of July 17, 1974. The altercation resulted in a two-count complaint being filed in the Magistrate Court of St. Francois County, on July 17, 1974, charging defendant with an assault and with exhibiting a dangerous weapon and, on that same date, defendant was arrested. Subsequently, on October 30, 1974, the state filed a nolle prosequi of the charge. Approximately 16 months later, on February 24, 1976, the same charges were made against defendant by complaint filed in the magistrate court and defendant was re-arrested.[1] The record does not reflect the date of defendant's preliminary examination on these charges. However, 5 months later, on July 13, 1976, the record shows that the "cause was transcripted" to the circuit court, and some 6 months after that, on January 7, 1977, a two-count information was filed against defendant charging him, in Count I, with an assault and, in Count II, with exhibiting a dangerous weapon. Shortly thereafter, on January 21, 1977, defendant filed a motion to dismiss on the grounds that he was denied his right to a speedy trial and that the delay also violated his "due process rights". This motion was set for hearing, and, after a continuance requested by both the state and defendant, the motion was heard and overruled on April 22, 1977. After an additional 4 month delay, caused in part by defendant's change in counsel and his disqualification of the original trial judge, defendant's trial began on September 1, 1977.[2]

During the discussion immediately prior to trial, defendant renewed his motion to dismiss, again arguing the denial of his right to a speedy trial and the denial of his "due process rights", and, also, added a new ground of denial of his rights, under our state "speedy trial statute", related to terms of court, § 545.900 RSMo. However, on appeal, defendant only argues his Sixth Amendment right and, thus, has abandoned his other complaints against the delay prior to trial.

For greater clarity the foregoing facts are organized in the following table:

| PROCEDURAL EVENT | DATE | TIME INTERVAL IN APPROXIMATE MONTHS |
|---|---|---|
| Two-Count Complaint Filed. Defendant Arrested. | July 17, 1974 | |
| | | 3½ Months |

[1] The record does not explicitly show whether defendant's two arrests were made without warrants prior to the complaints being filed or with warrants after the complaints were filed. However, since the state tacitly concedes that both arrests were legal and since complaints were filed in both instances, it is assumed that defendant was arrested on warrants issued on the complaints, or, if arrested without warrants, warrants were obtained on the complaints within 20 hours of the arrests. Rule 21.14.

[2] Just prior to trial, the court refused the state permission to amend Count I and dismissed that Count because it was defectively pleaded.

| PROCEDURAL EVENT | DATE | TIME INTERVAL IN APPROXIMATE MONTHS |
|---|---|---|
| Nolle Prosequi of Charge. | October 30, 1974 | |
| | | 16 Months |
| Identical Two-Count Complaint Filed. Defendant Re-Arrested. | February 24, 1976 | |
| | | 5 Months |
| "Cause Transcripted to Circuit Court." | July 13, 1976 | |
| | | 6 Months |
| Two-Count Information Filed. | January 7, 1977 | |
| Motion to Dismiss Filed. | January 21, 1977 | |
| | | 1 Month |
| Case Called and Motions Set For Hearing on March 4, 1977. | February 14, 1977 | |
| Motion to Dismiss Continued and Reset at Request of State and Defendant. | March 4, 1977 | |
| | | 1½ Months |
| Motion to Dismiss Heard and Overruled. Trial Set for August 24, 1977. | April 22, 1977 | |
| | | 4 Months |
| Defendant's Counsel Permitted To Withdraw. | August 12, 1977 | |
| Defendant's Motion For Disqualification Filed, Sustained. | August 15, 1977 | |
| New Judge Appointed. Trial Set For September 1, 1977. | August 16, 1977 | |
| | | ½ Month |
| Trial Begins. | September 1, 1977 | 37½ Months |

We now turn to consider these facts in the light of the test defined in *Barker.*

A. *Length Of Delay*

■ The length of the delay is "to some extent a triggering mechanism", for, unless the delay is presumptively prejudicial, no further inquiry need be made into the other factors which complete the test. *Barker v. Wingo, supra,* 407 U.S. at 530, 92 S.Ct. at 2192.

Defendant complains of an approximate 3 year delay, computing the length of the delay from the date of his first arrest, July 17, 1974, to the date of his trial, September 1, 1977. The state measures the delay from the date of defendant's second arrest on February 24, 1976, and, thus, discusses an approximate 18 month delay, from the date of this arrest to trial. However, neither party addresses or explains specific language used by our State Supreme Court

forcefully implying that defendant's right to a speedy trial would not be activated until the information was filed on January 7, 1977, *State v. Caffey*, 438 S.W.2d 167, 171 (Mo.1969); *State v. York*, 511 S.W.2d 758, 761 (Mo.1974);[3] thus, limiting the delay to approximately 8 months.

We resolve this conflict by considering the basic purpose and policy underlying the speedy trial provision of the Sixth Amendment found in *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In that case, the Supreme Court considered a 3 year delay between the alleged criminal acts and the indictment, where no arrest or other formal charge had preceded the indictment. By explaining that "the protection of the [Sixth] Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution", *id.* at 313, 92 S.Ct. at 459, the Court emphasized the speedy trial provision of the Sixth Amendment has no application and is not activated until the putative defendant in some way becomes an "accused". Since no other formal charge had preceded the indictment, the Court there held the defendants were "accused" only when the indictment was filed and, for this reason, refused to extend the protection of the right to a speedy trial to the pre-indictment period.

However, the Court went on to state that invocation of the right to a speedy trial need not await an indictment, information, or other formal charge, and that an arrest and holding to answer to a criminal charge will activate the right to a speedy trial, because, as the Court specifically stated:

". . . the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. . . . So viewed, it is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *United States v. Marion, supra*, 404 U.S. at 320, 92 S.Ct. at 463.[4]

By this statement, the Court not only specifically designated and enumerated several possible governmental acts which may label a suspect as an "accused" during a criminal prosecution, but, more importantly, the Court focused attention on the evils incident to an arrest which are protected against by the Sixth Amendment and, thus, furnished the rationale for constituting a suspect an "accused" on the date of his legal arrest and for beginning the speedy trial period on that date.

3. For similar language or holding to the same effect, *see State ex rel. Brooks v. Bone*, 473 S.W.2d 681, 682 (Mo.1971); *State v. Gardner*, 534 S.W.2d 284, 286 (Mo.App.1976); *State v. Odzark*, 532 S.W.2d 45, 48 (Mo.App.1976); *Billings v. State*, 503 S.W.2d 57, 61 (Mo.App.1973); *See also Skelton v. State*, 578 S.W.2d 323, 325 (Mo.App.1979).

4. The Court also stated that a defendant is protected from inordinate delay prior to "accusal" by the Due Process Clause of the Fifth Amendment. A defendant demonstrates a violation of his right to a speedy trial under the Due Process Clause if he can show that the delay ". . . caused substantial prejudice to

[his] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over [him]." *United States v. Marion, supra*, 404 U.S. at 324, 92 S.Ct. at 465. Thus, it is understandable why defendant abandons his complaint under the Due Process Clause here and pursues his Sixth Amendment right. To sustain his complaint under the Sixth Amendment, he need not show actual prejudice but he would have to show actual prejudice to sustain his due process complaint. Thus, if he fails to meet the speedy trial standard of the Sixth Amendment, then *a fortiori*, he would be unable to meet the more stringent requirements under the Due Process Clause.

Further clarification came in the subsequent decision of *Dillingham v. United States*, 423 U.S. 64, 65, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975), where the Court specifically held that an arrest during a federal prosecution constitutes a suspect as an "accused" and the arrest constitutes the initiation of prosecution for the purposes of applying the speedy trial test of *Barker v. Wingo, supra.*

■ Similarly, in the present case, defendant's right to a speedy trial begins at the time of arrest. In Missouri, legal arrest and being taken into custody because of the arrest parallels the federal process of arrest and detention, and legal arrest and detention in Missouri is no less a public assertion by the state of probable cause to believe a defendant committed a crime than it would be pursuant to federal process.[5]

More importantly, once the warrant of arrest is executed and the defendant legally taken into custody, the defendant is subjected to the financial, social and psychological prejudice referred to in the *Marion* and *Dillingham* cases, just as if he were being subjected to federal process. On being legally arrested, he must either obtain bail or remain in jail until his preliminary examination; he must obtain counsel to protect his interests; he must explain his arrest to his friends and family; and public scorn is our community's normal reaction to an arrest. Thus, in Missouri, legal arrest and being legally detained because of that arrest may, in the explicit words of the Court in the *Marion* case, "seriously interfere with the defendant's liberty, whether he is free on bail or not, . . . [it] may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends". *United States v. Marion, supra,* 404 U.S. at 320, 92 S.Ct. at 463. In short, at the time of his legal arrest, he begins to suffer the financial, social and psychological prejudice and harm that the right to a speedy trial is designed to protect against and, thus, his arrest constitutes him as an "accused" and his right to a speedy trial begins.[6]

5. We are aware of the apparent surface differences between the federal and state processes supporting a legal arrest and detention, i. e., the difference between the federal and state requirements for obtaining a warrant of arrest.

To obtain a federal warrant of arrest, facts must be presented from which the Magistrate can form a judgment as to the existence of probable cause for making the arrest, Fed.R. Crim.P. 3, 4; and the Magistrate may not accept without question the applicant's conclusion that the prospective defendant has committed a crime, *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), but must be "supplied with sufficient information to support an independent judgment that probable cause exists for the warrant". *Whiteley v. Warden,* 401 U.S. 560, 564, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971).

In Missouri, it has been said that the requirement of probable cause is satisfied by an "unconditional affidavit", merely reciting the facts which constitute the offense. *State v. Thomas,* 353 Mo. 345, 182 S.W.2d 534 (1944); Rule 21.08. *See also* Scurlock, *Basic Principles of the Administration of Criminal Justice with Particular Reference to Missouri Law,* 41 U.M. K.C.L.Rev. 165, 181 (1972).

Whether this difference in requirements is constitutionally acceptable, *see Scurlock, supra,* the difference is not meaningful here. Regardless of the difference, it is the issuance of the warrant which constitutes the public assertion by the state that it believes the prospective defendant has committed a crime and, thus, it is the fact that a determination of probable cause was made to support the issuance that is critical and not the method used to reach that determination.

6. The *Marion* case does state that it is the "actual restraints imposed by arrest *and holding to answer a criminal charge* " that engage the protection of the speedy trial provision of the Sixth Amendment. *United States v. Marion, supra,* at 320, 92 S.Ct. at 463 (emphasis added). Argument can be made that, in Missouri, because of the significant difference between the informal probable cause determination for issuing a warrant, Rule 21.08, and the formal safeguarded procedure of a preliminary examination, Rule 23.02 et seq., the arrestee is not "[held] to answer a criminal charge" until a probable cause determination is made at the preliminary examination and, thus, in Missouri, it is the preliminary examination which activates the right to a speedy trial.

This argument ignores the financial, social and psychological prejudice and harm incident to an arrest which is protected against by the Sixth Amendment and which the arrestee would suffer from the time of his arrest until his preliminary examination.

The previously noted language to the contrary used by our State Supreme Court in the *Caffey* and *York* cases, *supra*, that, under Missouri's criminal procedure, the right to a speedy trial is not activated until the filing of an information or indictment, is obviated by the rationale of *Marion*, as clarified by the holding in *Dillingham*.

First, *Dillingham's* clarification was handed down a year after the *York* case and gives more explicit meaning to the right to a speedy trial by its more specific definition of an "accused". Also, in both the *Caffey* and *York* cases, the precise issue presented to the Court was whether the right to a speedy trial was initiated by a complaint filed in the magistrate court and, thus, the Court's language limiting the activation of that right only to an indictment or information was unnecessary to the Court's narrow holding that the filing of a complaint does not activate the right to a speedy trial. This narrow holding is still valid. The principal and, perhaps, single function of a complaint is to serve as the basis for an application for an arrest warrant, § 544.020 RSMo; Rule 21.08. Being merely an application, which can be refused for constitutional or statutory non-compliance, the complaint itself places no actual restraints on the putative defendant nor does its filing require him to begin to protect his interests; thus, although the complaint may be the first step in a criminal prosecution, *see State v. Nichols*, 330 Mo. 114, 49 S.W.2d 14, 19 (1932); *State v. Flannery*, 263 Mo. 579, 173 S.W. 1053, 1055 (1915), the complaint does not "initiate a criminal prosecution" and it does not make the putative defendant an "accused" as those terms are defined in *Marion* and *Dillingham*, for the complaint itself does not initiate any of the financial, social or psychological harm protected against by the right to a speedy trial.

However, as noted, a legal arrest and being taken into custody, which follow a complaint, do give rise to those evils protected against by the right to a speedy trial and, thus, we follow the rationale of *Marion* and the mandate of *Dillingham* and hold that defendant's right to a speedy trial was activated by his legal arrest and being taken into custody. *See State v. Paxton*, 535 S.W.2d 558, 560 (Mo.App.1976).

Since defendant was arrested and detained on two different occasions for the charge in issue, the questions then arise: which arrest activates his right to a speedy trial and what is the period of delay which is protected against and is to be used as the possible "triggering mechanism" for further inquiry into the remaining factors of the *Barker* test?

Insofar as the length of delay is a "triggering mechanism" for further inquiry, a possible acceptable answer to these questions, on the present record, would be the state's contention that the second arrest should activate defendant's right to a speedy trial. An exhibiting charge is relatively uncomplicated and, thus, the 18 month delay following the second arrest would by itself be presumptively prejudicial, requiring further inquiry into the other *Barker* factors.

However, choosing the second arrest as the incident which activates defendant's right to a speedy trial necessarily forecloses any inquiries into the first period of accusation, into possible prejudice to defendant resulting from this first delay, into the causes for the state's nolle prosequi and like matters. Because we believe these further inquiries are essential to a proper determination of whether defendant's right to a speedy trial was denied, we must consider the merits of defendant's contention that the proper measure of delay is the total time between the first arrest and trial.

The delay from defendant's first arrest to trial can be divided into three distinct time periods: (1) the 3½ month period from the first arrest to the nolle prosequi, when he first stood "accused"; (2) the 16 month period between the nolle prosequi and the second arrest, when no accusation was pending; and (3) the 18 month period between his second arrest and trial, when he again stood "accused". To support his contention that all three of these periods must be included to compute the delay in issue,

defendant cites *Klopfer v. North Carolina, supra*, and, although defendant's reliance on the *Klopfer* case is misplaced [7] there is ample other authority to support his contention.

Those Courts who have included the period between a dismissal and a second arrest as part of the protected period have done so for the stated reason that failure to include this period "would allow the government to circumvent the speedy trial requirement by successively dismissing and reinstituting a complaint or indictment for the same offense", *United States v. Avalos*, 541 F.2d 1100, 1108–1109, fn.13, (5th Cir. 1976), cert. denied, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977), or that during this intervening quiescent period, the defendant may still suffer from the harms protected against by his right to a speedy trial, *United States v. MacDonald*, 531 F.2d 196, 204–205 (4th Cir.1976), rev'd. on other grounds, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978), or for no stated reason other than, under *Marion* or *Dillingham*, the initial arrest engages the speedy trial provision of the Sixth Amendment. *United States v. Walters*, 591 F.2d 1195, 1200–1201 (5th Cir. 1979); *Jones v. Morris*, 590 F.2d 684, 686 (7th Cir. 1979); cert. denied, 440 U.S. 965, 99 S.Ct. 1513, 59 L.Ed.2d 780 (1979); *United States v. Roberts*, 548 F.2d 665, 667 (6th Cir.1977), cert. denied, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977); *United States v. Merrick*, 464 F.2d 1087, 1090 (10th Cir.

1972), cert. denied, 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314 (1972).

Others have segmented the periods into "accusal" and "non-accusal" periods and, considering each of these periods as a separate and distinct entity, have excluded the "non-accusal" periods from the Sixth Amendment protection. *Arnold v. McCarthy*, 566 F.2d 1377 (9th Cir. 1978) ("accusal period"—arrest to mistrial; "non-accusal period"—dismissal without prejudice to re-arrest; "accusal period"—re-arrest to re-trial). Apparently, the rationale for this approach is that during the "non-accusal" periods, the defendant does not stand charged of any crime nor is he under any form of restraint. Because he no longer is an "accused" in any legal or practical sense, he no longer can be said to suffer from the potential harm the right to a speedy trial protects against; and thus during this interval, he is not entitled to invoke that right. Under this segmented approach, the *Barker* test is separately and independently applied to each period of "accusal", and, during the "non-accusal" periods of delay, recourse is had to the Due Process Clause of the Fifth Amendment to determine whether actual prejudice was caused by these "non-accusal" periods. *Id.* at 1382–1386.

Application of each of these two methods for computing the length of delay, as well as application of other methods, raise logical and practical problems.[8] However, we use the former method in the

---

7. The delay condemned in the *Klopfer* case followed "an unusual North Carolina criminal procedural device known as the 'nolle prosequi with leave'" *Klopfer v. North Carolina, supra*, 386 U.S. at 214, 87 S.Ct. at 989, which, when secured by the prosecutor, did not result in the dismissal of the charge but, rather, allowed the charge to remain pending, subject to the prosecutor restoring the case for trial at his option. The "nolle prosequi with leave" was, in effect, a general continuance. The charge remained pending and effective and, thus, continued the state's public accusation without interruption.

8. The method of including the period when the defendant no longer stands accused—the "non-accusal" period—extends protection to the defendant for a period of time not contemplated

by the definition of the right to a speedy trial. As stated in the body of the opinion, during this period, he is under no restraint or public accusation and, thus, cannot be said to suffer from the potential prejudice or harm the right to a speedy trial protects against. However, under this method, including the "non-accusal" period is used only for the limited purpose of determining the length of delay as a "triggering mechanism"; and, if further inquiry is triggered, then the protection remains extended during the "non-accusal" period, if, but only if, the cause for the delay during this period was unjustified, such as a deliberate attempt by the state to delay the trial in order to hamper the defense.

The method of segmenting the periods and applying the *Barker* test independently to each

instant case because it not only permits all essential inquiries required by the defined protection of the right to a speedy trial but, also, at the same time, maintains the flexibility of the *Barker* test without affecting its design or purpose. Using the initial arrest as the inception of the prosecutorial process and the trial as the culmination of that process, makes the entire delay the possible "triggering mechanism", and, if further inquiry is triggered, the court necessarily will determine, under the other *Barker* factors, whether the dismissal which occurred during this period was justified or not, whether the period between dismissal and the second arrest should be weighed against the state, whether defendant suffered prejudice from the total period of time he stood accused, etc. Thus, the Court is enabled to make a rational evaluation of all relevant facts which may affect a defendant's right to a speedy trial.

■ By use of this method, on the present record, the approximate length of delay was approximately 3 years—from the initial arrest to trial. As indicated, in light of the relatively uncomplicated charge of exhibiting a dangerous weapon, the 3 year delay must be considered presumptively prejudicial, requiring further inquiry into the other factors of the *Barker* test. *State v. Morris*, 501 S.W.2d 39 (Mo.1973). However, we do not consider the delay itself so lengthy as to automatically weigh heavily against the state or amount to prejudice per se. *See Barker v. Wingo, supra*, (5 year delay—no denial of speedy trial); *State v. Gay*, 523 S.W.2d 138 (Mo.App.1975) (3½ year delay—no denial of speedy trial).

**B.** *Reasons For The Delay*

Turning to the second factor, reasons for the delay, the prosecutor did state, without supporting evidence, that witnesses in this case were difficult to locate, during a discussion not specifically directed to the reasons for delay.

■ Aside from this less than equivocal statement, the state has not offered nor does the record indicate any reason for the 3½ month delay from the first arrest, on July 17, 1974, until the filing of the nolle prosequi, on October 30, 1974. Furthermore, the delay of 5 months from the second arrest, on February 24, 1976, until the "cause was transcripted" to the circuit court, on July 13, 1976, and the additional delay of 6 months thereafter, until an information was filed on January 7, 1977, remain unexplained. Since the state has failed to justify these delays while defendant was an "accused", this time is weighed heavily against the state. *See Morris v. Wyrick*, 516 F.2d 1387, 1390 (8th Cir. 1975), cert. denied 423 U.S. 925, 96 S.Ct. 268, 46 L.Ed.2d 251 (1975).

■ The 16 month period between the nolle prosequi and the second arrest also remains unexplained. However, there is no indication that this delay was caused by the state's negligence nor is there any indication that the filing of the nolle prosequi and ensuing delay was a deliberate attempt by the state to hamper the defense, or, as will later appear, that the defense was, in fact, hampered; and, since defendant was not an

separate and distinct "accusal" period is more rigorous in its logic, but this method may well result in each separate "accusal" period by itself being insufficient to trigger further inquiry into the other *Barker* factors, while the total time of all the "accusal" periods would compel such an inquiry.

Logical and practical difficulties of equal proportion are encountered by other methods such as tacking the "accusal" periods together, since the total time of all the "accusal" periods tacked together may be insufficient to trigger an inquiry into the cause of a possible unjustified lengthy delay between each of the "accu-

sal" periods; and the method argued for by the state—to start from the second arrest—simply ignores the first "accusal" period which, because defendant stood "accused", compels Sixth Amendment protection. *But see United States v. Davis*, 487 F.2d 112 (5th Cir. 1973), cert. denied, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974), where the period of delay was measured from the second indictment on the same charge. *Compare State v. Morton*, 444 S.W.2d 420 (Mo.1969) and *State v. Wigger*, 196 Mo. 90, 93 S.W. 390 (1906), interpreting our state "speedy trial statutes" related to terms of court, § 545.890–545.920 RSMo.

"accused" nor under any restraint whatsoever during this period, there is no sensible reason to hold this "non-accusal" period against the state.

■ In addition, the subsequent 8 month delay, from the filing of the information to the date of trial is not held against the state, because this delay is attributable to defendant. A few days after the information was filed, defendant filed a motion to dismiss for failure to grant him a speedy trial and, although defendant obviously cannot be penalized for the normal delay necessary for the hearing of this motion, defendant chose not to hear the motion on the date set for hearing but rather requested that the hearing be continued. After the hearing on this motion, and a ruling adverse to defendant, the cause was set for trial on August 24, 1977. Again, rather than proceeding directly to trial, defendant's attorney was permitted to withdraw on August 12, 1977, and on August 24, 1977, defendant's new attorney disqualified the trial judge by motion. The next day, the newly assigned judge set the case for trial on September 1, 1977.

Quite obviously, the delays after the filing of the information were substantially attributable to the defendant and, absent defendant's actions, there is no reason to believe he would not have received a trial immediately or soon after his motion for dismissal was overruled. Thus, defendant cannot complain of the 8 month delay after the information was filed. *State v. Keeny,* 431 S.W.2d 95, 98–99 (Mo.1968); *State v. Gay, supra,* 523 S.W.2d at 141–142; *State v. Rice,* 522 S.W.2d 656, 658–659 (Mo.App. 1975).

### C. *Assertion Of The Right To Speedy Trial*

The third factor to be considered is the assertion by defendant of his Sixth Amendment right.

Whether a defendant asserts this right is closely related to the other noted factors; for the more seriously he is affected by the length or the reason for a delay or by personal prejudice resulting from the delay, the more likely he is to complain. Thus, "[w]hether and how a defendant asserts his right" should be considered when making the balancing test, and his "assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right". *Barker v. Wingo, supra,* 407 U.S. at 531–532, 92 S.Ct. at 2192–2193.

■ In relation to the filing of the information, on January 7, 1977, defendant was prompt in asserting his right to a speedy trial by his motion to dismiss filed some two weeks later, on January 21, 1977. However, in evaluating the weight to be given this assertion, it is noteworthy that the record shows no effort by defendant to move the process along from the time of his second arrest until the filing of the information. Admittedly, defendant had no affirmative duty to bring himself to trial, *see Barker v. Wingo, supra,* 407 U.S. at 527, 92 S.Ct. 2182; *Dickey v. Florida,* 398 U.S. 30, 37–38, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), but, obviously, this did not preclude him from seeking a quick preliminary examination after his second arrest. Of more particular importance, to sustain the evidentiary strength of the assertion of the right to a speedy trial, a defendant must, at least, permit the assertion of his right to be disposed of and his trial to commence in an orderly fashion. Here, as previously noted, defendant delayed the disposition of his motion to dismiss by requesting a continuance of the hearing of this motion; and the commencement of his trial, after being set, was delayed by the withdrawal of defendant's counsel and his disqualification of the original trial judge.

Defendant's actions after the assertion of his right to a speedy trial belie and are contrary to his stated concern for a speedy trial and, thus, his actions lessen if not vitiate the evidentiary strength of that assertion.

### D. Prejudice Resulting From Delay

The final factor to be considered, prejudice to the defendant, encompasses three general interests of the defendant that the right to a speedy trial was designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired". *Barker v. Wingo, supra,* 407 U.S. at 532, 92 S.Ct. at 2193.

Although it is not clear that defendant complains about all three of these interests, we address all of them. As to the first interest, it appears from the record that defendant was granted bail after both of his arrests and that he was incarcerated for only one day, after his bond was forfeited; and, thus, it is clear that he suffered no oppressive pretrial incarceration. As to the second interest, it is clear that during the 16 month period between the nolle prosequi and the second arrest, defendant was under no accusation whatsoever and should have suffered no real anxiety or concern. With regard to the remaining periods when defendant stood "accused", it might be argued that a certain degree of anxiety and concern existed in this case as they exist in almost all criminal cases. However, "that alone does not establish prejudice where, as here, the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific instances". *Morris v. Wyrick, supra,* 516 F.2d at 1391. As to the third interest, the record reflects no impairment of defendant's defense. No significant witnesses were lost. Virtually all persons described as being present at the scene of the altercation testified as witnesses for either the state or the defense, and review of their testimony indicates only a few differences in slight detail, with no witness having any noticeable difficulty in remembering the events in question. As to the fourth factor, we conclude the record reflects no prejudice to defendant.

■ We balance and weigh the foregoing four related factors cognizant of the admonition that "[a]n overzealous application of the 'unsatisfactorily severe remedy of dismissal', *Barker v. Wingo,* . . . would infringe 'the societal interest in trying people accused of crime, rather than granting them immunization because of legal error. (Citation omitted)' ". *State v. Morris, supra,* 501 S.W.2d at 41. Without detailing the facts again, we are disturbed by the state's delay in securing an information, but this must be weighed against the complete absence of actual prejudice to defendant resulting from the delay; and, thus, we conclude defendant's Sixth Amendment right to a speedy trial was not denied, even though the delay in question is not a model of prosecutorial initiative or concern. *See United States v. Cabral,* 475 F.2d 715, 720 (1st Cir. 1973).

■ Defendant next attacks the permission granted the state to amend the information just prior to trial by deleting a phrase from the information and by endorsing additional witnesses. Up to the day of trial defendant had been charged in the information with exhibiting a "12 gauge shotgun". On the day of trial, over defendant's objection, the state was permitted to delete the words "12 gauge" from the information. Contrary to defendant's claim, this deletion was not error.

Under Rule 24.02, an information may be amended at any time before the verdict is returned if "no . . . different offense is charged and if substantial rights of the defendant are not prejudiced". Reference to the statutory definition of the crime of exhibiting a dangerous or deadly weapon in a rude, angry or threatening manner, § 564.610 RSMo., demonstrates clearly that the deletion of the words "12 gauge" does not affect any of the elements of this crime and, thus, the amendment does not result in defendant being charged differently than he was in the original charge.

Furthermore, no substantial rights of the defendant are prejudiced by this deletion. The test to determine whether the amendment prejudiced his rights is:

"whether a defense under the charge as originally made would be equally available after the amendment and whether defendant's evidence would be equally applicable after, as well as before, the amendment. *State v. Taylor*, 375 S.W.2d 58 (Mo.1964)." *State v. Wilson*, 544 S.W.2d 859, 862 (Mo.App.1976).

Defendant's theory of defense was that he exhibited the weapon in self defense. This defense would be available and evidence supporting it would be applicable whether or not the type or caliber of the weapon was designated and, thus, the deletion of the gauge of the shotgun from the information did not prejudice defendant. *See State v. Sorrells*, 50 S.W.2d 1018, 1019 (Mo.1932); *State v. Tunnell*, 296 S.W. 423, 425 (Mo.1927).

■ Defendant's attack on the state's endorsement of additional witnesses also lacks merit. Some time prior to trial, defendant had filed a motion opposing these endorsements, contending surprise and seeking a continuance, and, then, at trial, he formally withdrew this motion, and, thus, in effect, waived his claim of prejudice. *State v. Webb*, 432 S.W.2d 218, 221 (Mo.1968); *State v. Cross*, 357 S.W.2d 125, 127 (Mo. 1962).[9]

Defendant's third contention, also a two-part attack, is that the state's examination of defendant was impermissibly broad and that his cross examination of the victim, Larry Turner, was improperly limited.

Defendant specifically complains that the state was allowed to cross examine him on matters beyond the scope of his direct testimony in violation of § 546.260 RSMo., which limits the cross examination of a defendant to facts developed "in his examination in chief".

Defendant took the stand to support his theory of self defense and, on direct examination, he limited his testimony to the following questions and answers:

Q. "At the time that you shot at and hit Larry Turner (the victim), what was your state of mind?"

A. "I was afraid."

Q. "What?"

A. "I was afraid he was going to kill me."

Then, on cross examination, over defendant's objections, the state was permitted to ask defendant whether he had a shotgun, what kind of shotgun it was, whether he remembered firing the shotgun at Larry Turner, how many times he fired the gun, and when and where the shooting occurred.

■ Having testified in his own behalf, a defendant may be cross examined about those matters he testified to on his direct examination and he may be contradicted and impeached as any other witness. *State v. Wallace*, 504 S.W.2d 67 (Mo.1973), cert. denied 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76 (1974). Furthermore, the state is not confined to a rote recitation or a categorical review of those matters covered on defendant's direct examination but, rather, may inquire into all matters within the fair purview of the direct examination. *State v. Scown*, 312 S.W.2d 782, 786–787 (Mo.1958); *State v. Rice*, 522 S.W.2d 335, 338 (Mo.App.1975). More specifically, if the defendant refers to a subject in a general way on direct examination, he may be cross examined in detail about that subject, and "[w]hen he states a fact in relation to his actions, the state may inquire as to particular circumstances which would throw light on that fact". *State v. Williams*, 519 S.W.2d 576, 578 (Mo.App.1975).

**9.** Defendant does not contend that the reason he withdrew his request for continuance was to avoid the sacrifice of his right to a speedy trial; for a reasonable continuance would not necessarily have deprived defendant of this right and, thus, as noted, his failure to seek a continuance precludes him from complaining of being sent to trial. *State v. Maxie*, 513 S.W.2d 338, 341 (Mo.1974), cert. denied 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 40 (1975).

As a matter of fact, subsequently, defendant's counsel did orally move for a continuance, not because of alleged late endorsement of witnesses but because of an alleged change in the charge against defendant.

In his direct examination, quoted above, defendant testified to the shooting in a general way and testified specifically to his state of mind. Thus, quite properly the state was permitted to inquire in detail about the shooting itself, where and when it occurred, whether defendant remembered shooting, etc. More particularly, since defendant testified that he was afraid, in order to support his self-defense theory, it was quite proper for the state to question whether defendant's stated fear was reasonable and credible in light of the surrounding circumstances and to question whether his actions were consistent with his theory of self defense.

Thus, we find the trial court did not abuse its considerable discretion in controlling the scope of cross examination. *State v. Thomas*, 552 S.W.2d 63, 65 (Mo.App. 1977); *State v. Rice, supra; State v. Williams, supra.*

Defendant's claim that his cross examination of the victim, Larry Turner, was too narrowly limited is based upon the following series of questions asked of Larry Turner by defendant's counsel, which the court found objectionable.

After a series of questions on cross examination, defendant's counsel asked Larry Turner:

"You'll fight anybody a fair fight, you say, is that right?", and Turner answered, "That's right."

The court then sustained the state's objection to the following series of consecutive questions put by defendant's counsel to Turner:

Q. "Tell us who you fought most recently in a fair fight."

Q. "Are you a brawler?"

Q. "Do you know what a brawler is?"

Q. "Well, how many fights [have] you been in this year?"

Defendant apparently assumes these questions were designed to establish Turner's reputation for violence and, from this, defendant apparently argues the answers to these questions would be admissible as relevant evidence in support of defendant's theory of self defense. Contrary to defendant's assumption, these questions are not designed to establish Turner's reputation, but, rather, at best, are designed to elicit specific acts of violence which are not connected with the defendant. Certainly, evidence of a reputation for violence is admissible to support a self-defense theory, but this evidence must be proved by testimony concerning general reputation evidence, and not, as was attempted here, by specific acts of violence which are not connected with defendant. *State v. Maggitt*, 517 S.W.2d 105, 107 (Mo. en banc 1974) (murder); *State v. Nelson*, 484 S.W.2d 306, 308 (Mo.1972) (assault). Thus, defendant's assumption about these questions is incorrect, and his argument based upon this erroneous assumption is unsound.

Also, defendant apparently contends this line of questioning is a permissible attack on Turner's credibility. Certainly, defendant has the right to attack Turner's credibility by showing his interest, bias and prejudice concerning the issues on trial and the state of Turner's feelings toward defendant, *State v. Day*, 339 Mo. 74, 95 S.W.2d 1183, 1185 (1936), or by questioning Turner's veracity or accuracy. *See State v. Lynch*, 528 S.W.2d 454, 458 (Mo.App.1975). Here, however, the noted questions were not designed to elicit any of this permissible impeaching testimony but, rather, at best, were inquires into totally collateral incidents, remote in time from the exhibiting charge and not otherwise connected with the exhibiting itself. Thus, the trial court did not abuse its discretion in refusing to permit defendant to go into these collateral matters. *State v. Brotherton*, 266 S.W.2d 712, 715 (Mo.1954); *State v. Lynch, supra,* 528 S.W.2d at 457–458.

As his last contention, defendant argues there was a fatal variance between the information and the verdict di-

recting instruction and, further, there was insufficient evidence to submit the cause to the jury on the verdict directing instruction as drafted.

The information charged defendant with exhibiting a deadly and dangerous weapon "in the presence of one or more persons". In submitting the case to the jury, the general phrase—"in the presence of one or more persons"—was changed to the more specific phrase—"in the presence of Larry Turner".

The record does not disclose any pretrial attempt by defendant to question the propriety of the general phrase—"in the presence of one or more persons"—or to attempt to ascertain the identity of those persons referred to by the phrase—"one or more persons". Thus, the state could have gone to the jury on a verdict directing instruction that merely required a finding that defendant exhibited a dangerous weapon "in the presence of one or more persons". But, in its verdict directing instruction, the state with sufficient evidentiary basis chose to identify one of those unnamed persons referred to in the information and, admittedly, the verdict directing instruction thus varied from the information. For defendant to prevail in his complaint against this variance, he must first show he was prejudiced by the variance. *State v. Pitchford*, 556 S.W.2d 57, 59 (Mo.App.1977); *State v. Collins*, 519 S.W.2d 362, 364 (Mo.App.1975).

Here, the change from the general to the specific was beneficial rather than prejudicial to defendant. Rather than requiring the state to prove the lesser burden that the exhibiting was done in the presence of one or more persons whose specific identity need not have been proved, the verdict director required the state to prove the exhibiting was done in the presence of a specifically identified person. In effect, the state took on an additional and, here, unnecessary burden, from which defendant could have suffered no prejudice. *See State v. Brewer*, 540 S.W.2d 229, 231 (Mo.App.1976); *State v. Turner*, 537 S.W.2d 850, 852–853 (Mo.App.1976).

Defendant additionally complains there is no evidence to support the submission that the exhibiting was actually done in the presence of Larry Turner.

Again, contrary to defendant's complaint, the record amply supports this submission. The record shows that Larry Turner and some friends drove up to the scene of the incident in question in a truck and, for reasons not relevant here, an argument occurred between Turner and defendant. Turner drove off, saying he was going to get the police. After Turner's departure, two of defendant's friends left and brought back a shotgun to defendant. After ascertaining the shotgun was loaded, defendant fired a shot at a nearby road sign and stated, according to one of Turner's friends who had remained behind: "This [is] what I'm goin' to do with your buddy when he gets back." When Turner returned, he stopped the truck some distance from defendant, and defendant, concealing the shotgun, called for Turner to come over. Turner refused and started to drive from the scene. However, as Turner pulled his truck out on the road, he saw defendant "raise a gun up". Turner knew "it was a shotgun" and, after he saw the shotgun, he ducked down. Defendant then fired the shotgun and hit Turner.

Certainly, then, there was ample evidence to submit the charge of exhibiting a dangerous weapon "in the presence of Larry Turner". *State v. Owen*, 457 S.W.2d 799, 802–803 (Mo.1970); *State v. Overshon*, 528 S.W.2d 142 (Mo.App.1975).

The judgment is affirmed.

DOWD, P. J., and CRIST, J., concur.